UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Dr. Bailey Quinn, O.D., : | |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| Dr. Stewart Mackie, M.D. in his official capacity, : | |
| Defendant : | March 10, 2026 |
| : | |

**COMPLAINT**

I.   **INTRODUCTION**

1.   The plaintiff, Dr. Bailey Quinn, D.O., brings this action against the defendant, Dr. Stewart Mackie, M.D., acting in his official capacity as University of Connecticut Pediatric Residency Program Director. Quinn alleges that after she was "doxxed" for her advocacy for Palestine and her criticism of the State of Israel, Mackie repeatedly acted to penalize her, including by disrupting and improperly interfering with, and ultimately terminating her pediatric residency, and that his goal was to chill her speech and that of others. Quinn alleges that Mackie, acting in his official capacity, retaliated against her for her exercise of free speech in violation of the First Amendment and Fourteenth Amendment to the Constitution of the United States, and in violation of Connecticut General Statutes §31-51q. Quinn brings her federal claim pursuant to 42 U.S.C. §1983 and seeks her damages under federal and state law, including for lost wages and benefits, and compensatory damages, including for her lost career opportunities, reputational harm, and pain, suffering, and emotional distress. Quinn also seeks an award of her reasonable attorney's fees and costs.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §1331. The Court has supplemental jurisdiction over plaintiff's claims under Connecticut General Statutes §31-51q, pursuant to 28 U.S.C. § 1367(a) where those claims are so related to plaintiff's federal claims that they form part of the same case or controversy. Alternatively, the Court has diversity jurisdiction over plaintiff's claims under Connecticut General Statutes §31-51q, pursuant to 28 U.S.C. § 1332, where the matter in controversy exceeds $75,000.00 and is between Quinn, a resident of Michigan, and Mackie, who is a resident of Connecticut and who is sued in his official capacity as University of Connecticut Pediatric Residency Program Director.

3. Venue is appropriate in the District of Connecticut pursuant to 28 U.S.C. §1391(b), because a substantial part of the events giving rise to his claim occurred within this judicial district.

## III. PARTIES

4. The plaintiff, Dr. Bailey Quinn, D.O. (hereinafter, "Quinn"), is a resident of Marquette, Michigan.

5. The defendant, Dr. Stewart Mackie, M.D. (hereinafter, "Mackie"), is, at all times relevant to this Complaint, the Program Director for the University of Connecticut Pediatric Residency Program. The University of Connecticut is a public university system. As such, Mackie is a state actor for purposes of the plaintiff's claims under the First and Fourteenth Amendments.

IV.     **FACTS**

6.     Dr. Bailey Quinn, D.O., holds a Bachelor of Science degree in Biology from the University of Florida, a Masters of Science degree in Biomedical Science from the University of South Florida, and a Doctor of Osteopathic Medicine ("D.O.") from the Touro College of Osteopathic Medicine, Harlem, New York City, New York. From July 2023 through June 2025, Quinn worked as a pediatric resident physician at Connecticut Children's Medical Center, during which time she was enrolled in the University of Connecticut Pediatric Residency Program.

7.     At various times in 2023 and 2024, Quinn made statements on social media expressing support for the people of Palestine and criticism of the State of Israel.

8.     Dr. Stewart Mackie, M.D., is, at all times relevant to this Complaint, the Program Director of the University of Connecticut Pediatric Residency Program.

9.     In or about December 2023, Quinn was "doxxed" by the organizations Stop Antisemitism and Canary Mission.[1] Stop Antisemitism is an internet-based organization which claims to be dedicated to exposing groups and individuals that espouse incitement towards the Jewish people and State and engage in antisemitic behaviors. Canary Mission is an anonymously run doxxing website that publishes the personal information of students, professors, and organizations that it claims are anti-Israel or antisemitic, focusing primarily on people at North American universities.

10.     Through such social media outlets as "X" (formerly Twitter), Instagram, and Change.org, Stop Antisemitism and Canary Mission publicly attacked Quinn for her public advocacy on social media for Palestine and her criticism of the State of Israel. These attacks

---

[1] "Doxxing" refers to the publishing of private or identifying information about a particular individual on the internet, typically with malicious intent. "Doxxing." Oxford Languages, Google, 2026, www.google.com/search?q=define+doxxing. Accessed 3/8/2026.

all prominently featured the information that Quinn was a pediatric resident at UConn Health, a healthcare system and hospital, and branch of the University of Connecticut that is funded directly by the State of Connecticut. The attacks included requests that individuals contact UConn Health to complain about Quinn.

11. On or about January 3, 2024, the American Board of Pediatrics contacted Mackie in his capacity as the Program Director of the pediatric residency program and inquired what action was being taken to investigate Quinn for her social media posts.

12. On or about January 12, 2024, Quinn was informed by Dr. Steve Angus, M.D., of the Office of Graduate Medical Education of the University of Connecticut School of Medicine that Quinn would be issued a Letter of Misconduct without Adverse Action, on the basis that Quinn's social media posts constituted "ethnic discrimination."

13. Quinn met with Dr. Angus to appeal the decision on the basis that it violated her rights under the 1st and 14th Amendments to the Constitution of the United States, and that her advocacy for Palestine was based on opposition to the State of Israel not on opposition to Judaism or the Jewish people.

14. On or about January 23, Dr. Angus informed Quinn that he had reversed his decision and no letter of misconduct would be issued.

15. Between March and June 2025, Mackie carried out a series of actions directed against Quinn designed to penalize her for her protected speech regarding Palestine and Israel, culminating in terminating Quinn from the residency program.

16. On or about March 15, Quinn made an offhand comment during an interdisciplinary meeting between the resident and nursing teams. Later that day, Mackie called Quinn into his office and told her he was referring her to the Clinical Competency Committee for her lack of professionalism in making the comment.

17. Shortly thereafter, Quinn went before the Clinical Competency Committee, took responsibility for her comment, and apologized.

18. On or about March 29, Mackie informed Quinn she was being given a Letter of Misconduct without Adverse Action because of the March 15 comment.

19. Quinn was on approved FMLA medical leave from the end of March and for much of April.

20. On or about May 2, Quinn met with Dr. Mackie and Dr. Hoppa to discuss the requirements of the Letter of Misconduct and agree upon completion dates.  Quinn then met with her mentor, Dr. Emily Hogeland, about meeting the requirements of the Letter of Misconduct.

21. In meeting with Dr. Hogeland, Quinn discussed having been initially penalized for engaging in political advocacy unrelated to her work, and suggested the program's treatment of residents' outside political advocacy was an issue that should be discussed at a resident business meeting. Dr. Hogeland agreed it was an important topic that should be discussed.

22. On or about May 9, Quinn submitted a written comment that the advocacy issue should be discussed in the resident business meeting scheduled for May 10.

23. Quinn's submitted comment was not mentioned in the meeting. Before the close of the meeting Quinn raised the advocacy issue and talked about her experience.

24. Later that day Mackie placed Quinn on administrative leave because of her comments, which he treated as a further violation of her Letter of Misconduct, and again referred Quinn to the Clinical Competency Committee.

25. In an email exchange with Mackie and in meeting with the Clinical Competency Committee, Quinn produced evidence showing her discussion of the program's treatment of residents' outside advocacy was appropriate and non-threatening.

26. On or about May 20, Quinn received a Letter of Misconduct with Adverse Action, extending Quinn's residency by one month and failing her in the metric of professionalism for the year. The Letter of Misconduct was initiated by Mackie and falsely described her use of FMLA medical leave as "calling out," raised specious concerns about her professionalism, and falsely alleged Quinn had refused work. These were issues that had not previously been raised with Quinn.

27. On or about May 29 and May 30, Quinn challenged the Letter of Misconduct with Dr. Eric Hoppa, the assistant program director and the head of the Clinical Competency Committee. In both discussions, Dr. Hoppa ended by referring Quinn to Mackie to answer any questions.

28. When Quinn addressed her concerns to Mackie he again cited issues that had not previously been discussed with Quinn.

29. On or about June 21, Quinn appealed the decision to fail her in the metric of professionalism for the year to the Clincal Competency Committee. Quinn learned that at the time of issuing the Letter of Misconduct the Committee was unaware that her absences were for FMLA medical leave. Nonetheless, the Committee rejected her appeal.

30. On or about July 1, Dr. Juan Salazar chief of pediatrics at Connecticut Children's Medical Center, rescinded the extension of Quinn's residency, but the Letter of Misconduct remained in place.

31. In or about August and September, Quinn appealed the decision to fail her in the metric of professionalism for the year, and questioned why medical leave issues would be used to determine metrics of professionalism. The appeal was denied.

32. From on or about September 23 to October 18, Quinn was on an FMLA medical leave of absence. When she returned on or about October 21, Mackie placed Quinn on administrative leave and referred her to HAVEN for a fitness for duty examination. HAVEN is a health assistance program authorized by Connecticut law to serve health care professionals.

33. HAVEN deemed Quinn fit to return to work on January 9, 2025. On or about January 13, Quinn returned to work.

34. On or about January 23, HAVEN informed Quinn that it closed her file with no recommended follow up monitoring.

35. In February, Quinn called in sick for several shifts due to her medical condition.

36. Although Quinn had approved accommodations in place due to her medical condition. Mackie contacted Quinn and said her use of sick time had a negative impact on the residency program. Mackie instructed Quinn to make attendance a priority.

37. Quinn was assigned to and worked day shifts in pediatric intensive care from on or about March 10-22, and night shifts in pediatric intensive care from on or about March 23-28.

38. Concerned about the impact her work schedule was having on her health, Quinn requested chief resident Lauren Costigan to talk to Mackie about a change in schedule. Costigan agreed to do so, but did not follow up with Quinn.

39. On or about March 31, Quinn returned to the day shift on the pediatric intensive care unit. That evening, Quinn submitted a request for a change in schedule. Quinn explained she had not been feeling well, was concerned she would be sick if she continued on the

7

schedule, but was also concerned by Mackie's insistence that her attendance should be a priority.

40. On or about April 1, Mackie placed Quinn on administrative leave and again referred Quinn to HAVEN for a fitness for duty examination. Without consultation with the clinical team Quinn had worked with, Mackie falsely claimed that Quinn had admitted to being "impaired" at work.

41. When Quinn attempted to challenge Mackie's referral to HAVEN, she was told by Dr. Miller from GME that even stating that without a change in schedule she might not "fully be able to participate in the residency program" was reason enough to refer Quinn to HAVEN.

42. As a result of the referral to HAVEN, Quinn was required to attend a "comprehensive evaluation" at the University of Florida Recovery Center. When contacted for collateral information about Quinn, Mackie provided false information to the evaluator regarding Quinn's workplace conduct and the accommodations she had sought.

43. Based on false information provided by Mackie, Quinn was found unfit for duty and referred to the Professional Renewal Center in Kansas.

44. Shortly before attending the Professional Renewal Center program on or about June 17, Quinn made a written request that her administrative leave be extended so that she could complete the program there, as required by HAVEN.

45. On or about June 20, the Capital Area Health Consortium informed Quinn that effective June 17, she has been redesignated from Administrative Leave to Medical Leave.

46. On or about June 25, Quinn was informed that her position in the UConn pediatrics program will no longer be held, and that the decision is non-appealable.

47. On or about June 26, the Capital Area Health Consortium informed Quinn that, due to her termination from the UConn pediatrics program, her employment at the Consortium was terminated.

48. On or about July 28, Quinn contacted Dr. Wendy Miller of the UConn GME office to inform her Quinn hac completed the requirements of the HAVEN program. The following day, Miller responded that Quinn was eligible to "reapply" for a position in the UConn pediatric residency program.

49. Aware that there were two vacant positions in the residency program, Quinn inquired about reapplying. Miller responded that UConn was not recruiting to fill those positions.

## V.     COUNT ONE: VIOLATION OF RIGHT TO FREE SPEECH UNDER THE 1ST AND 14TH AMENDMENTS

1. The plaintiff re-states, re-alleges, and incorporates by reference paragraphs 1 through 49, above.

50. Quinn's public advocacy on social media for Palestine and her criticism of the State of Israel are speech on matters of public concern protected by the First and Fourteenth Amendments to the Constitution of the United States.

51. Mackie's actions as described above were in retaliation for Quinn's protected speech.

52. As a result of Mackie's retaliatory treatment, Quinn suffered harm to her reputation, loss of career opportunities, and other economic and compensatory damages, including pain, suffering, and emotional distress.

## VI.	COUNT TWO: VIOLATION OF CONN.GEN.STAT. §31-51q

1. The plaintiff re-states, re-alleges, and incorporates by reference paragraphs 1 through 49, above.

50. Quinn's public advocacy on social media for Palestine and her criticism of the State of Israel are speech on matters of public concern protected by the Connecticut General Statutes §31-51q.

51. Mackie's actions as described above were in retaliation for Quinn's protected speech.

52. As a result of Mackie's retaliatory treatment, Quinn suffered harm to her reputation, loss of career opportunities, and other economic and compensatory damages, including pain, suffering, and emotional distress.

## REQUEST FOR RELIEF

WHEREFORE, the plaintiff asks the Court to award relief and damages as follows:

1. Award the plaintiff damages for the defendant's violation of her rights under the First and Fourteenth Amendments to the Constitution of the United States, and under Connecticut General Statutes §31-51q, including for the plaintiff's lost wages and benefits of employment and lost career opportunities.

2. Award the plaintiff damages for the defendant's violation of her rights under the First and Fourteenth Amendments to the Constitution of the United States, and under Connecticut General Statutes §31-51q, including for the plaintiff's pain, suffering and emotional distress.

3. Award the plaintiff her reasonable attorney's fees and costs in the pursuit of this action; and

4. Award such other damages as the Court may see fit.

## REQUEST FOR A JURY TRIAL

The plaintiff respectfully requests a jury trial as to all of her claims to the extent she is is entitled by law.

RESPECTFULLY SUBMITTED
BAILEY QUINN,
THE PLAINTIFF, by

 */ s / Peter Goselin*
Peter Goselin ct06074
The Law Office of Peter Goselin
P.O. Box 331313
Hartford, Connecticut 06133
Tel. 860-580-9675
Fax 860-232-7818
pdgoselin@gmail.com